IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CHARLES L. THOMAS, | ) | Case No. 3:25-cv-00441-JJH |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.     Introduction

Plaintiff, Charles Thomas, seeks judicial review of the final decision of the Commissioner of Social Security, denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Thomas' applications for DIB and SSI be affirmed.

## II.    Procedural History

Thomas filed for DIB and SSI on February 10, 2022, alleging a disability onset date of February 19, 2021. (Tr. 217-32). The claims were denied initially and on reconsideration. (Tr. 110-47). He then requested a hearing before an ALJ. (Tr. 148). Thomas (represented by counsel) and a vocational expert ("VE") testified before the ALJ on October 16, 2023. (Tr. 40-64). On

February 2, 2024, the ALJ issued a written decision finding Thomas not disabled. (Tr. 10-27). The Appeals Council denied his request for review on January 13, 2025, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; see 20 C.F.R. §§ 404.955, 404.981). Thomas timely filed this action on March 5, 2025. (ECF Doc. 1).

## III.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Thomas was 45 years old on the alleged onset date, making him a younger individual according to Agency regulations. (*See* Tr. 26). He graduated from high school. (*See id.*). In the past, he worked as a retail cashier and hand packager. (*Id.*).

### B.     Relevant Medical Evidence

On February 19, 2021, Thomas presented to the hospital with acute onset of right gaze deviation, dysarthria, and left hemiparesis. (Tr. 334-35). On examination, he was positive for visual disturbance, facial asymmetry, speech difficulty, and weakness, but negative for chest pain, palpitations, or shortness of breath. (Tr. 339). He was assessed with right hemispheric stroke. (Tr. 345). A CT of his brain was negative for bleed. (Tr. 337, 344-45). A noncontrast MRI of his brain revealed evidence of bihemispheric infarcts. (Tr. 335). Blood pressure was initially in the 170s and increased to the 200s; he was given 20 mg of labetalol and intravenous tPA. (Tr. 337). Stroke workup included a hemoglobin A1c of 5.9; lipid profile showed total cholesterol of 101 and LCL of 45; echocardiogram showed an ejection fraction of 55-60%; and evidence of moderate pericardial effusion. (Tr. 335). Due to normal findings, an internal loop recorder was placed to monitor Thomas' heart function. (*Id.*). During his hospitalization, Thomas worked with physical and occupational therapy, and physical medicine rehabilitation, who recommended safe disposition to inpatient rehab. (*Id.*). Thomas was emotionally labile and

2

tearful during his hospitalization due to an inability to pay for his care; he ultimately left on February 23, 2021 against medical advice due to cost and concerns about who would care for his teenage daughter during his stay. (*Id.*). He was recommended to follow up with cardiology and the stroke clinic. (*Id.*).

On March 29, 2021, Thomas met with Samantha Davis, M.D. for follow up after his stroke. (Tr. 421). On examination, he was emotionally labile and tearful; he had poor dentition; his right extremity strength was 5/5, left was 4/5; and he had mild gait irregularities due to residual right sided weakness. (Tr. 424). He was recommended to follow up with cardiology regarding his implanted loop recorder placement, as well as to return to the clinic in one month for blood pressure follow up. (Tr. 425).

On May 3, 2021, Thomas followed up with Dr. Davis. (Tr. 417). Dr. Davis noted that Thomas had residual deficits in balance, fine motor skills, chewing food, left sided weakness, and dysarthria, but they were slowly improving. (Tr. 419). He was unable to lift well above 45 degrees in his left upper extremity, and his lower extremity heaviness caused occasional tripping when walking. (*Id.*). He had a depressed mood due to his social situation, but his emotional lability and anxiety were improved. (*Id.*). He had right extremity strength of 5/5, but left extremity strength of 4/5. (Tr. 420). He had not been able to follow up with physical, occupational, or speech therapy; neuro, cardiology, physical medicine and rehabilitation, or electrophysiology. (Tr. 419). Dr. Davis ordered a referral to case management to assist Thomas in following up. (*Id.*).

On November 15, 2021, Thomas met with Ashley Schneider, M.D. (Tr. 648). He reported that he had not attended the post-stroke therapy referrals but was doing home workouts. (Tr. 650). He reported difficulty speaking, that his words did not sound the same, and that he had lost

3

his visual acuity. (*Id.*). He was taking aspirin and atorvastatin. (*Id.*). Dr. Schneider referred Thomas for speech therapy and neuro-ophthalmology, and recommended smoking cessation to reduce his stroke risk. (Tr. 651).

On September 20, 2021, Thomas met with Clarissa Pena, M.D. for evaluation of his hypertension. (Tr. 652). On examination, he had poor dentition with teeth missing and loose, and gingival erosion; diminished strength of 4/5 in his left upper extremity; slightly lowered left lower extremity strength compared to right; and mild gait irregularities due to residual left sided weakness. (Tr. 655). His blood pressure was 153/107, with a systolic goal under 130. (*Id.*). Thomas had attempted to meet with cardiology, but the facility did not accept his insurance; Dr. Pena made a new referral to a different provider. (Tr. 656). Thomas met with a social worker but had not followed up with vascular neurology, cardiology, electrophysiology, physical, occupational, or speech therapy; or physical medicine and rehabilitation; Dr. Pena again referred to case management for assistance in organizing these follow ups. (*Id.*). She continued Thomas on aspirin, Lipitor, and Coreg. (*Id.*).

On May 2, 2022, Thomas followed up with Dr. Pena. (Tr. 836). On examination, he had poor dentition with teeth missing and loose; diminished strength of 4/5 in his left upper extremity; and mild gait irregularities due to residual left sided weakness. (Tr. 839). Thomas met with a social worker, but had not followed up with vascular neurology, cardiology, electrophysiology, physical, occupational, or speech therapy; or physical medicine and rehabilitation; Dr. Pena again referred to case management for assistance in organizing these follow ups. (*Id.*). Dr. Pena also made a dentist referral and recommended follow up in two months. (Tr. 840).

On March 6, 2023, Thomas attended an annual exam with Dr. Davis. (Tr. 1033). Thomas' residual deficits were improving, and his mood was improved on Zoloft 50 mg. (Tr. 1036). Dr. Davis noted Thomas had been unable to follow up with referrals despite multiple reorders, due to insurance coverage. (*Id.*). Thomas was compliant with taking his aspirin and statin. (*Id.*). On examination, he had all teeth removed, had blurry vision, and mild speech difficulty. (Tr. 1039-40). Dr. Davis recommended follow up in six months. (Tr. 1043).

On June 5, 2023, Thomas met with Sohrab Kadivar, M.D. for functional review and forms. (Tr. 1003-19). At this visit, Thomas had had all teeth extracted and was waiting for dentures. (Tr. 1007). He had speech difficulty due to his stroke but was able to communicate. (Tr. 1008-09). Dr. Kadivar also referred Thomas to case management for long term follow up and to arrange for supports for social determinants of health. (Tr. 1010).

On August 28, 2023, Thomas attended an appointment with Dr. Pena requesting follow up on prior referrals. (Tr. 969-87). He was positive for dental problems and for speech difficulty. (Tr. 974). Dr. Pena referred Thomas to ophthalmology; speech, physical, and occupational therapy; and dentistry. (Tr. 975). His blood pressure was well controlled at 130/86; Dr. Pena continued Zoloft, atorvastatin 40 mg, hydrochlorothiazide 25 mg and Coreg 25 mg, and provided a blood pressure kit for recommended regular at-home monitoring. (Tr. 975-76).

On September 7, 2023, Thomas attended an occupational therapy evaluation with Kelly Farley, OT. (Tr. 942-51). OT Farley noted Thomas had not received any therapy services since his stroke. (Tr. 943). Thomas had his teeth removed in October or November 2022, but did not have a dental follow up scheduled until February 2024. (*Id.*). Thomas reported trouble with multitasking; that he used to have 20/20 vision before his stroke; he described that his arms were strong, but they did not work together well. (*Id.*). Thomas reported that he failed the

maneuverability portion of his driving test after his stroke and did not have a driver's license. (Tr. 945). During the visual exam, Thomas reported blurriness and that sometimes his eyes will lock onto something and not move even if he turns his head. (*Id.*). He had 20/25 near vision and 20/100 distance vision. (*Id.*). OT Farley assessed Thomas with vision and cognition deficits; and with difficulty in his functional motor skills bilaterally, demonstrated as difficulty coordinating and engaging his bilateral upper extremities simultaneously. (Tr. 946). OT Farley recommended occupational therapy twice weekly for eight weeks. (Tr. 947).

Also on September 7, 2023, Thomas attended speech therapy evaluation with Laurie Sheehy, M.Ed., CCC-SLP. (Tr. 953-66). During the evaluation, Thomas described memory issues affecting his ability to attend therapy; he had missed a June 2023 appointment due to losing his phone, and he had forgotten his bike on the bus when traveling to the present appointment. (Tr. 955). He reported his swallowing was "'okay'" but that his voice was inconsistent and didn't always "'come out right.'" (*Id.*). SLP Sheehy observed Thomas' vocal quality as "wet/gurgly" at times, but within functional limits at other times. (Tr. 957). His vocal expression was impaired. (Tr. 957-58). She assessed Thomas with a fair prognosis, noting that over two years had passed since his stroke, limiting his recovery; but he appeared motivated and willing to participate in speech therapy. (Tr. 958). SLP Sheehy also recommended Thomas attend counseling and access Medicaid taxi service to assist him in attending appointments. (*Id.*). She recommended speech and language therapy twice weekly. (*Id.*).

On September 11, 2023, Thomas attended physical therapy with Ryan Morton, PT. (Tr. 924). Thomas reported difficulty carrying things, putting his pills together, and with fine motor tasks such as peeling an egg or cooking a pancake. (Tr. 926). He reported issues with memory and operating a washing machine, and that he must now concentrate on all tasks. (*Id.*). He denied

6

falls but reported multiple instances of tripping over his feet. (*Id.*). He reported difficulty with his speech as his biggest concern, and that sometimes he can not speak, or if he does speak, the words he wants to say do not come out. (*Id.*). He exercises at home two or three times per week, does push-ups, and will walk or ride his bike. (*Id.*). PT Morton noted reduced gait speed with increasing distance, and occasional toe drag during swing phase of gait. (Tr. 927). Strength was 5/5 in all extremities. (Tr. 927-28). However, PT Morton observed reduced core strength which contributed to Thomas' difficulty with balance tasks and placed him at increased risk of falls. (Tr. 930). As a result, he assessed Thomas with decreased strength and endurance, impaired balance, and decreased mobility. (*Id.*). He recommended physical therapy twice per week for six weeks but noted barriers to improvement included Thomas' chronicity of stroke effects and delayed rehab services, as well as possible blunted neuroplasticity due to beta blockers' effect on heart rate zone. (Tr. 930-31).

### C. Medical Opinion Evidence

On July 8, 2021, Thomas attended an independent medical evaluation conducted by Ryan Lakin, M.D. (Tr. 622). Dr. Lakin noted Thomas' strength deficits resolved, but he still had residual speech deficits with slurred speech but no difficulty word finding. (*Id.*). His activities of daily living were normal, and Thomas could sit, stand, and walk without difficulty; he rode his bike to the exam. (*Id.*). On examination, Thomas' reflexes were 2+/4 at bilateral biceps, patellar, and Achilles; strength was 5/5 in all extremities; he had no motor aphasia; he had normal gait and could perform reciprocating heel-to-toe and tandem walking, and was able to stand on leg by itself; he had no trouble getting on and off the exam table. (Tr. 623). In Dr. Lakin's opinion, Thomas could lift and carry 10-20 pounds frequently, which he defined as 2-6 hours per day, 20-50 pounds occasionally for 2 hours per day, but could not carry greater than 50 pounds. (Tr.

624). Thomas could sit continuously with regular breaks; stand and walk with regular breaks; but had limited speech and his communication was affected. (*Id.*).

On August 18, 2021, consultative examiner Daniel Watkins, Ph.D., conducted a psychological evaluation. (Tr. 632-37). Thomas denied any history of psychiatric illness or behavioral health treatment. (Tr. 634). Thomas reported that he performs self-care with difficulty. (*Id.*). He no longer drives but instead takes public transit or rides his bicycle. (*Id.*). He has fallen off of his bicycle since his stroke. (*Id.*). During the examination, Thomas had pressured, circumstantial, and overinclusive speech; his speech was also garbled and hard to understand. (*Id.*). He appeared anxious and tearful during the examination and endorsed depressive symptoms but denied diagnosis or labels. (Tr. 634-35). Dr. Watkins noted superficial insight and that Thomas was defensive about being seen as psychologically ill, and may at times underestimate his level of depression or anxiety. (Tr. 636). Thomas otherwise had adequate judgment to allow for independent functioning, participation in treatment, and simple, work-related decision making. (*Id.*). Dr. Watkins diagnosed depressive and anxiety disorders, and mild vascular neurocognitive disorder; he recommended optimal treatment to include psychotherapy and substance use components. (*Id.*). Dr. Watkins also noted cognitive slippage, working memory, and concentration difficulties related to Thomas' stroke. (*Id.*). In Dr. Watkins' opinion, Thomas was limited to simple, concrete, one- or two-step instructions, with possibly more repetition or explanation of instructions than the typical worker. (Tr. 637). Dr. Watkins also opined Thomas was limited to simple, concrete multistep tasks that could be overlearned and were within his physical limitation. (*Id.*). Thomas was limited to a low-pressure work setting. (*Id.*).

On October 12, 2022, state agency reviewers Mehr Siddiqui, M.D., and David Dietz, Ph.D., reviewed Thomas' record but were unable to provide an opinion due to insufficient evidence after Thomas missed a consultative examination. (Tr. 68-69).

On April 5, 2023, consultative examiner Angelina Wong, N.P. conducted an internal medicine evaluation for Thomas' disability application. (Tr. 899-908). Thomas reported he did not know he had high blood pressure before his stroke, and he was under a lot of stress at the time. (Tr. 899). He had not been able to follow up with recommended therapies due to lack of insurance. (*Id.*). He has been taking his blood pressure medication daily since the stroke. (Tr. 900). He endorsed depression and anxiety, and reported withdrawal from social situations; Zoloft helps. (*Id.*). He reported taking Zoloft 50 mg, aspirin 81 mg, potassium 20 mEq, and hydrochlorothiazide 25 mg daily. (*Id.*). He reported being able to manage his activities of daily living and did not need help at home. (Tr. 901). His vision was 20/70 on a Snellen chart at 20 feet without glasses, and he was aware he needed to see an eye doctor. (*Id.*). His gait was normal; he could walk on his heels with some difficulty, could walk on his toes without difficulty, and had mild difficulty with tandem walk (some issues may have been related to his clothing). (*Id.*). Pulses in both feet were weak and diminished. (Tr. 902). In NP Wong's opinion, Thomas had mild limitations in carrying and lifting heavy items. (Tr. 903). Range of motion and strength were noted as normal bilaterally in all examined areas. (Tr. 904-08). Gait was normal, but heel and tandem walking were with difficulty; squat was full and stance normal. (Tr. 908). Grip strength was 5/5 bilaterally; Thomas could make a closed fist; he could oppose all fingers; and he could pinch, grasp, and manipulate small and large objects. (*Id.*).

On February 22, 2023, state agency reviewer Jennifer Swain, Psy.D., reviewed Thomas' records and opined that he was capable of performing simple, routine tasks in an environment

without strict time demands or high production quotas; and capable of working in an environment with no more than occasional non-routine work related changes. (Tr. 91-92).

On April 21, 2023, Indira Jasti, M.D. reviewed Thomas' record at the reconsideration level. (Tr. 90-91). She noted Thomas had complied with examination and she had sufficient evidence to provide the following opinion: exertional level consistent with light work; further limited to four hours standing/walking; never climbing ladders, ropes, or scaffolds; and avoiding all exposure to hazards. (Tr. 89-91). She also opined that due to these limitations, a sedentary exertional level might be more appropriate. (Tr. 93).

On June 5, 2023, Dr. Kadivar completed a basic medical evaluation for the Ohio Department of Job and Family Services. (Tr. 317). In it, he noted Thomas had strength of 3/5 in all extremities; full range of motion, with delay; dysarthria; left hemiparesis; and emotional lability. (*Id.*). Dr. Kadivar also noted hypertension, food insecurity, inconsistent medications, and issues obtaining care due to insurance. (*Id.*). Dr. Kadivar opined that Thomas could stand/walk for one hour, and could sit for eight hours, in an eight-hour workday. (Tr. 318). He could frequently lift/carry up to 20 pounds and occasionally lift/carry up to 25 pounds. (*Id.*). He was moderately limited in handling, repetitive foot movements, and speaking; and was not significantly limited in all other functional areas. (*Id.*). Dr. Kadivar based this opinion on his observations that Thomas had difficulty maintaining his posture when standing, had speech difficulty, and delayed purposeful movements in all extremities. (*Id.*).

On February 21, 2023, Thomas attended a consultative psychological evaluation with Jinhui Wang, Psy.D.. (Tr. 890-95). Thomas was taking Zoloft prescribed by Dr. Pena. (Tr. 891). He reported living alone and being able to complete personal self-care. (Tr. 892). Dr. Wang occasionally observed garbled speech, and that Thomas' expressive language was "mostly

intelligible." (Tr. 893). Thomas did not display issues with understanding or remembering questions during the interview, but his attention and concentration appeared marginal. (*Id.*). Dr. Wang opined Thomas would be able to understand, remember, and carry out simple instructions in a work setting. (Tr. 894). However, his ability to maintain attention and concentration, and persistence and pace, might deteriorate over extensive periods of time. (*Id.*). Dr. Wang also noted Thomas' depressive symptoms might negatively affect focus and concentration, and could lower his frustration tolerance and put him at risk for workplace pressure. (Tr. 894-95).

### D. Administrative Hearing Evidence

On October 6, 2023, Thomas testified before the ALJ. (Tr. 40-64). He testified that he had last worked the week he had a stroke (February 19, 2021). (Tr. 46-47). Prior to his stroke, he had worked at various jobs for three to six months at a time. (Tr. 47-50). The jobs included cashier, stocking shelves, and hand loading onto an assembly line at a factory; he was required to lift up to 50 pounds. (*See id.*). He had attempted to find work after his stroke but could not. (Tr. 50).

Thomas testified that he lived alone in a first-floor apartment with no steps to reach his apartment door. (Tr. 51). He did not have a driver's license and used public transportation or his bike for transportation. (Tr. 51-52). He completed his GED. (Tr. 52).

Thomas testified that he attends physical, occupational, and speech therapy three times per week. (Tr. 53). His therapy includes gait training. (Tr. 54). Thomas stated that he does not require a cane or walker, but his balance is poor. (*Id.*). He related that his therapists state he can walk, but he has problems with his left side and right side working together. (*Id.*). He drops things when holding them, and he has difficulty in tying and untying his shoes. (*Id.*). He cannot multitask since his stroke; he must concentrate on one action at a time. (Tr. 54-55). He was

11

unable to fulfill all therapies recommended by his doctors because of insurance and other issues. (Tr. 55). Thomas described an incident where he had all of his teeth removed for dentures, but that the office closed the next month and he was left without teeth or dentures; he was then unable to do speech therapy and was told to return after he obtained dentures. (Tr. 55-56). He continues to have speech issues since his stroke; he described that his voice "come[s] and goes" and that sometimes other people can understand him and other times they have difficulty. (Tr. 56). He stated that since his stroke, he has had problems with sustaining any activity beyond 30 minutes. (*Id.*). This issue causes him to have a low temper. (*Id.*). His doctors have stated that his issues will improve with time but will take a while. (*Id.*).

He did not describe mental health diagnoses, although he takes Zoloft for tearfulness after his stroke, without side effects. (*Id.*).

The VE then testified. (Tr. 57). She described Thomas' past work as retail cashier, DOT 290.477-014, light, including as performed, SVP 3; hand packager, DOT 920.587-018, medium, including as performed, SVP 2, unskilled. (Tr. 58).

The ALJ then provided the following hypothetical: an individual of Thomas' age, education, and work experience, who can work at a light exertional level, who can stand or walk for four hours, occasionally climb stairs or ramps, stoop, kneel, crouch, or crawl, can never climb ladders, ropes, scaffolds, or balance, must avoid all exposure to dangerous moving machinery and unprotected heights, work with a moderate level of noise, with work that can be learned in 30 days or less with simple, routine tasks and routine workplace changes, and is able to maintain concentration, persistence, and pace in two hour increments, but with no production rate pace work such as on an assembly line or with hourly quotas. (Tr. 58-59). The VE responded that such an individual could not perform Thomas' past work, but that they could perform some bench

12

work occupations including small parts assembler, DOT 739.687-030, light, SVP 2, with 22,000 jobs in the national economy; electrical accessories assembler, DOT 729.687-010, light, SVP 2, with 8,200 jobs in the national economy; and production assembler, DOT 729.687-010-light, SVP 2, with 15,000 jobs in the national economy. (Tr. 59). Upon questioning of assembly-line requirements by the ALJ, the VE conceded that the production assembler job would have end-of-day quota requirements, and she could not provide an accurate estimate of the jobs eroded by this requirement. (Tr. 59-60). In its place, she provided parking lot cashier with a sit/stand option, DOT 211.462-010, light, SVP 2, with 6,000 jobs in the national economy. (Tr. 60). The VE stated she could not opine as to any other representative jobs that would fit the hypothetical. (*Id.*). The ALJ added a restriction to change positions no more frequently than every 30 minutes while remaining on task for the small parts assembler, electrical accessories assembler, or parking lot cashier jobs identified. (*Id.*). The VE testified that her previous answer remained despite the additional restriction. (Tr. 61).

The VE further testified that average employer tolerance for time off-task was between zero to ten percent, or up to six minutes every hour. (Tr. 61). Employer tolerance for absenteeism, including arriving late or leaving early, would be no more than one occurrence within a 30-day period. (*Id.*). Termination would result if the individual were off-task or absent greater than these tolerances. (*Id.*). If the person required additional breaks beyond fair labor standards, they would need to obtain an accommodation from human resources. (Tr. 61-62).

## IV.    The ALJ's Decision

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.

2.    The claimant has not engaged in substantial gainful activity since February 19, 2021, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

13

3.     The claimant has the following severe impairments: stroke; neurocognitive disorder; depression; and anxiety (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.     After careful consideration of the entire record, the undersigned finds the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: he can stand or walk for four hours, can occasionally climb stairs or ramps, stoop, kneel, crouch, or crawl; can never climb ladders, ropes, scaffolds, or balance, as that term is used vocationally. Must avoid all exposure to dangerous moving machinery and unprotected heights. Work with a moderate level of noise. Work with an option to change positions no more frequently than every 30 minutes, while remaining on task. With work that can be learned in 30 days, or less, with simple routine tasks, and routine work- place changes. Is able to maintain concentration, persistence, and pace in two hours increments, with no production rate pace work such as on an assembly line, or with hourly quotas.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on June 22, 1975, and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from February 19, 2021, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 13-27).

**V.     Law & Analysis**[1]

**A.     Standard for Disability**

Social Security regulations outline a five-step process the ALJ must use to determine

whether a claimant is entitled to benefits:

1.     whether the claimant is engaged in substantial gainful activity;

2.     if not, whether the claimant has a severe impairment or combination of impairments;

3.     if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.     if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.     if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir.

2006). The Commissioner is obligated to produce evidence at Step Five, but the claimants bears

the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled

to benefits. 20 C.F.R. § 404.1512(a).

**B.     Standard of Review**

This Court reviews the Commissioner's final decision to determine if it is supported by

substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g);

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial

evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 587 U.S. 97, 103

(2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept

---

[1] The regulations governing DIB claims are found in 20 C.F.R. § 404, *et seq.* and the regulations governing SSI claims are found in 20 C.F.R. § 416, *et seq.* Generally, these regulations are duplicates and establish the same analytical framework. For ease of analysis, I will cite only to the relevant regulations in 20 C.F.R. § 404, *et seq.* unless there is a relevant difference in the regulations.

as adequate to support a conclusion.'" *Id.* quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-

16

13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 749 (6th Cir. 2007).

## VI. Discussion

Thomas brings two issues for this Court's review:

1.      Whether the ALJ erred when she failed to support her conclusions or discuss supportability and consistency when she evaluated the opinions of the treating and examining sources.

2.      Whether the ALJ committed harmful error when she failed to properly apply the criteria of Social Security Ruling 16-3p.

(ECF Doc. 7, p. 1).

### A.      The ALJ properly evaluated the medical opinion evidence.

In his first issue, Thomas states that, despite the 2017 changes in Social Security regulations eliminating the physician hierarchy, *see* 20 C.F.R. §§ 404.1520c, 416.920c, that the ALJ improperly failed to defer in her consideration of Dr. Kadivar's opinion. (ECF Doc. 7, pp. 7-10). Thomas argues that, even with the new regulations, the ALJ is still required to sufficiently explain their decision in a way that provides an accurate and logical bridge between the evidence and the result; in his view, the ALJ erred in her misstatement of Dr. Kadivar's treating relationship, and the ALJ erred in failing to include Dr. Kadivar's opined limitations in the RFC. (*Id.* at pp. 8, 10). As Thomas provides, the ALJ discussed Dr. Kadivar's opinion as a functional capacity assessment, despite Dr. Kadivar being a resident at the University of Toledo Medical center where Thomas regularly treated. (*Id.* at p. 8). In addition, Dr. Kadivar opined that Thomas could stand only one hour per day and lift only 20 pounds frequently and 25 pounds occasionally, but the ALJ failed to include this in his RFC. (*Id.* at p. 10). Thomas asserts these inconsistencies rise to the level of a failure to create a logical bridge when compared against his history of stroke and treatment history with Dr. Kadivar and other providers. (*Id.*).

17

Thomas also raises error with the ALJ's consideration of Dr. Lakin's consultative examination, stating that his July 2021 opinion was inconsistent with later evidence. (ECF Doc. 7, p. 10). Thomas states that the ALJ failed to support her conclusion that Dr. Lakin's opinion was persuasive and her adoption of these findings was in error. (*Id.*).

Thomas also raises error with the ALJ's consideration of the opinions of the psychological evaluators. (*Id.* at pp. 10-13). In his view, because the ALJ found the opinions of Drs. Watkins and Wang persuasive, she should also have adopted their opined limitations in full. (*Id.*). In support, Thomas cites to recent Sixth Circuit precedent as well as SSR 96-8p for the proposition that an ALJ's failure to either incorporate or adequately explain the omission is harmful error and should be remanded. (*Id.* at pp. 11-12, citing *Kinney v. Comm'r of Soc. Sec.*, No. 23-3889, 2024 WL 2273365, *4 (6th Cir. May 20, 2024); *Wilds v. Comm'r' of Soc. Sec.*, No. 24-5504, 2025 WL 1001806, *5 (6th Cir. March 31, 2025); SSR 96-8p).

In contrast, the Commissioner argues that the ALJ's decision was supported by substantial evidence and follows the regulations' requirement to discuss medical opinions in terms of supportability and consistency. (ECF Doc. 9, pp. 8-15). The Commissioner breaks out each of the challenged opinions and describes the reasons the ALJ provided for their respective persuasiveness findings, and the reasons the ALJ provided as to which opined limitations would be included in the resulting RFC. (*Id.*). The Commissioner distinguishes Thomas' reliance on *Kinney* and finds it inapposite, because the ALJ sufficiently explained her reasoning in Thomas' case. (*Id.* at p. 14). In sum, the Commissioner asserts that the Thomas' discussion of evidence in the record that cuts against the ALJ's decision and her explanation of the opinion evidence findings results in asking this Court to reweigh the evidence. (*Id.* at pp. 10-11).

On January 18, 2017, the Social Security Administration amended the rules for evaluating medical opinions for claims filed after March 27, 2017. See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017). As Thomas notes, the 2017 changes to the regulations eliminated the treating physician rule and an ALJ is no longer required to provide a treating physician's opinion controlling weight. *Compare* 20 C.F.R. §§ 404.1520c, 416.920c *with* §§ 404.1527, 416.927. The current regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. §§ 404.1520c(a); 416.920c(a). Thomas is again correct in stating that the revised regulations left intact the requirement that the ALJ must adequately explain their reasoning, and that an ALJ's failure to create a logical bridge between the medical evidence of record and the resulting RFC is reversible error. *See, e.g., Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011).

Thus, the controlling procedure for Thomas' case is as follows: before proceeding to Step Four of the sequential analysis, the ALJ determines a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. §§ 404.1520(e); 416.920(e). In doing so, the ALJ is required to "articulate how [she] considered the medical opinions and prior administrative medical findings." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). At a minimum, the ALJ must explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. §§ 404.1520c(b)(2); 416.920c(b)(2). Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors,"

such as familiarity with the disability program and other evidence in the record. 20 C.F.R. §§ 404.1520c(c)(3)-(5); 416.920c(c)(3)-(5).

According to the regulations, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. *See* 20 C.F.R. §§ 404.1520c(c)(2); 416.920c(c)(2). This is the consistency standard. And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be. *See* 20 C.F.R. §§ 404.1520c(c)(1); 416.920c(c)(1). This is the supportability standard.

I now turn to the ALJ's consideration of the challenged opinion evidence.

### 1.    Dr. Kadivar

The claimant presented for a functional capacity review and paperwork in June 2023. The forms were completed and faxed to Ohio Department of Job and Family Services by Sohrab Kadivar, PGY 1 (Exhibit 15F/98-102). On the referenced basic medical form the provider noted the claimant had normal breath sounds, strength was 3/5 in all extremities, he had left sided hemi paresis, emotional lability and dysarthria. He exhibited full range of motion with normal exam of spine and joints. His depression was stable.

In a physical functional capacity assessment the provider noted the claimant can stand/walk for 1 hour in an 8 hour workday and can stand/walk 1 hour without interruption. He can sit for 8 hours in an 8 hour workday and can sit 8 hours without interruption. He is able to lift/carry 11-20 pounds frequently and 21-25 pounds occasionally. He is moderately limited in his ability to handle, speak, and perform repetitive foot movements. He is not significantly limited in pushing/pulling, bending, reaching, seeing, and hearing. The examiner further noted the claimant has difficulty maintaining posture when standing and he has speech difficulty. He has delayed purposeful movements (Exhibit 16F). **The undersigned finds the opinion unpersuasive as the included objective findings are not supported by the other evidence of record regarding the claimant's strength findings and as they are internally inconsistent with the opined lifting/ carrying limitations included in the opinion.** Furthermore, the record documents the claimant was observed to have a normal gait at times and mild gait irregularities at other times. While his upper extremity strength, range of motion, and dexterity were documented as normal during a consultative exam, which occurred around the same

time as Dr. Kadivar's report, with Nurse Practitioner Wong. Moreover, the opinion is vague as to the claimant's limitations stating, "not significantly limited" and "moderately limited" without provided further specificity.

(Tr. 22) (emphasis added).

Here, it is apparent the ALJ complied with the regulations when describing her consideration of Dr. Kadivar's opinion. It may be true that the ALJ did not perfectly describe the reasoning according to the regulations – *i.e.*, she described the opinion as "not supported by the other evidence of record" and that it was "internally inconsistent" and thus transposed the regulatory terms. Nonetheless, I do not find this to be reversible error. On review, this Court considers the ALJ's decision "as a whole and with common sense." *See, e.g., Reusel v. Comm'r of Soc. Sec.,* No. 5:20-CV-1291, 2021 WL 1697919, at *6 (N.D. Ohio Apr. 29, 2021), quoting *Buckhanon ex rel. J.H. v. Astrue,* 368 F. App'x 674, 678-79 (7th Cir. 2010). Even with the ALJ's transposition of the regulatory terms, the ALJ considered the evidence within Dr. Kadivar's examination and opinion and contrasted it against the rest of the available medical record to ultimately determine it unpersuasive.

Even if I might agree that Dr. Kadivar likely should be considered Thomas' treating physician, the ALJ's mischaracterization as an examining physician does not result in reversible error. She "may" discuss consideration of treating physician evidence as an additional factor, "but is not required to" under the regulations. 20 C.F.R. §§ 404.1520c(b)(2); 416.920c(b)(2). And, arguably, the ALJ did accurately discuss this factor. The regulations ask the ALJ to discuss in terms of frequency of examinations, and length, purpose, extent, and nature of the source's treating relationship to the client. 20 C.F.R. §§ 404.1520c(c)(3); 416.920c(c)(3). Even though Thomas may have frequently treated at the University of Toledo Medical Center, it was not inaccurate for the ALJ to state that he "presented for a functional capacity review and

21

paperwork" and that Dr. Kadivar completed "a physical functional capacity assessment." (*Compare* Tr. 22 *with* Tr. 1001-19, 1054-55).

Finally, the ALJ ultimately explained her reasoning, using regulatory terms, and cited to accurate evidence in the record to make her determination that Dr. Kadivar's opinion was unpersuasive. It naturally follows that finding the opinion unpersuasive relieves an ALJ of any purported obligation to include opined limitations in the RFC. *See, e.g., Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) (explaining that even where an ALJ finds an opinion persuasive, there is no requirement to adopt all limitations).

With this, I find no reversible error on which to recommend remand.

### 2. Dr. Lakin

> Dr. Lakin opined the claimant can lift and carry in an 8 hour day, 10-20 pounds frequently 2-6 hours per day, 20-50 pounds occasionally 2 hours per day, greater than 50 pounds restricted. The claimant can sit continuously with regular breaks, and stand and walk with regular breaks. Communication is affected secondary to his limited speech. **The undersigned finds the opinion to be partially persuasive as the opinion provides a range of the claimant's lifting and carrying limitations consistent with Dr. Lakin's observations while the record supports the claimant would be more restricted to a reduced range of light work due to his combined impairments with a history left sided hemiparesis/weakness post stroke and with the more recent, later, treatment initiated with physical and occupational therapy as included in the assessments in Exhibit 15F.** The opinion is, otherwise, vague as to the claimant's communication limitations while other evidence notes the claimant demonstrated mild dysarthria and intelligible speech as included and cited below.

(Tr. 19) (emphasis added).

As with Dr. Kadivar's opinion above, I find the ALJ's consideration of Dr. Lakin's opinion compliant with the regulatory requirements to discuss in terms of supportability and consistency. I again rely on a common sense reading of the decision and find that I am able to follow the logic of the ALJ's decision.

However, I am unable to follow the logic of this portion of Thomas' argument. In his brief, he states:

> [Dr. Lakin's] report was partially persuasive as to [his] lifting and carrying limitations. This report in July 2021, however, was inconsistent with the later observations . . . [which] documented continuing problems which would further restrict [his] ability to stand/walk 6 hours a day. The ALJ failed to support her conclusion that this evaluation was persuasive and erroneously adopted its findings.

(ECF Doc. 7, p. 10, citing Tr. 19). I find Thomas' statement to be not fully accurate. As noted in the excerpt of the ALJ's decision above, the ALJ determined that Dr. Lakin's opinion was only partially persuasive, indeed because of his observations of Thomas' ability to lift and carry. In agreement with Thomas' assertion that later observations demonstrated continuing problems restricting his ability to work, the ALJ found Dr. Lakin's opinion inconsistent with later treatment in occupational and physical therapy. (*Compare id. with* Tr. 19). On this basis, the ALJ discounted Dr. Lakin's opinion and provided a more restrictive RFC than he opined, permitting a range of light work with no additional limitations on Thomas' ability to lift or carry, but with significant further restrictions on his ability to stand, walk, crouch, crawl, balance, climb stairs, and other related vocational restrictions. The ALJ supported this RFC decision by contrasting Dr. Lakin's July 2021 opinion against the September 2023 occupational and physical therapy records – notably, the very thing that Thomas asserts the ALJ should have done. I also note that the RFC finding an ability to meet light work expectations for lifting and carrying is not necessarily inconsistent with the later therapy sessions. On examination in September 2023, Thomas had "appropriate BLE strength testing at 5/5 MMT for all major muscle groups and ability to complete the test within normal time restraint. However, he does display reduced core strength based on limited plank hold whi[ch] contributes to difficulty with balance tasks." (Tr. 930).

Thomas has pointed to no reversible error with respect to the ALJ's consideration of Dr. Lakin's opinion. Indeed, it appears that the ALJ appropriately discounted the opinion, consistent with Dr. Lakin's own findings, and consistent with a longitudinal view of the record. I find no reason to recommend remand on this basis.

### 3. Dr. Watkins

Dr. Watkins opined that a payee for benefits was not needed, he can perform simple, concrete, 1-2 step instructions, he may require more repetition or explanation of instructions than would a typical worker, he is likely to be limited to simple concrete multistep tasks that can be overlearned, and that fall within his physical limitations. He might do best with tasks he already knows well how to perform. He has no particular problems in responding appropriately to supervision and to coworkers in a work setting, and he is likely to be limited to low pressure work setting (Exhibit 5F). **The undersigned finds the opinion to be mostly persuasive as it is generally consistent with the examiner's report and supported by the other evidence of record. Accordingly, the portions of the consultant's opinion that are not otherwise internally inconsistent (simple concrete 1-2 step instructions vs. simple concrete multistep tasks), have been accounted for within the adopted residual functional capacity herein to the extent supported by the longitudinal record. While also noting that portions of opinion are speculative using the terms "likely" and "may."**

(Tr. 19-20) (emphasis added).

As previously, the ALJ's consideration of Dr. Watkins' opinion is appropriately described in regulatory terms. The ALJ provided a comprehensive overview of Dr. Watkins' examination findings, and, reading the decision as a whole, sufficiently describes her consideration of the entire record. Thus, her consideration of the supportability and consistency of Dr. Watkins' opinion has the support of substantial evidence. Moreover, the ALJ notes the speculative nature of Dr. Watkins' opinion (*e.g.*, that Thomas "might do best with tasks he already knows well how to perform") and provides RFC limitations in more concrete vocational terms ("work that can be learned in 30 days, or less, with simple routine tasks"). (*Compare* Tr. 16 *with* Tr. 19-20, 632-37).

Although the ALJ found Dr. Watkins' opinion "mostly persuasive," she was not required to adopt all of his findings verbatim. *See, e.g., Reeves*, 618 F. App'x at 275. Neither does *Kinney* countenance otherwise. In *Kinney*, the ALJ found a medical opinion to be fully persuasive, but did not incorporate a portion of its limitations into the RFC, include the limitation in the hypothetical provided for the VE, or explain her reasoning for failing to include the limitation. *See generally Kinney*, 2024 WL 2273365. The Sixth Circuit reversed, stating "although the ALJ was not required to incorporate the flexible break scheduling limitation, the failure to do so without explaining its omission warrants reversal." *Id.* at *4. Here, the ALJ found Dr. Watkins' opinion only mostly persuasive, and explained her reasoning in failing to adopt all of his opined limitations. There is no error hindering a subsequent reviewer's ability to follow the logic contained in the ALJ's consideration of Dr. Watkins' opinion.

I again find no reversible error on which to recommend remand.

### 4. Dr. Wang

A psychiatric consultative exam was completed [by Dr. Wang] in February 2023. At the time of the exam the claimant endorsed problems with his concentration and difficulty focusing for a long time. He also reported having vision problems. He reported having a "pretty good" relationship with his siblings. He denied having problems with teachers and peers when he was in school and denied having problems with his past coworkers. He further related he had a pretty good relationship most of the time with past supervisors. As to his activities of daily living he reported he can tend to his own personal care such as dressing, showering, feeding, and using the bathroom. He does his own housework, and grocery shops twice monthly. He spends times socializing with his aunt and sister in person. On exam, he was observed to be groomed appropriately and was cooperative. His speech was garbled and his expressive language was intelligible. He appeared sad and denied having suicidal or homicidal thoughts. He appeared to be alert and responsive to person, place, time, and situation. During further cognitive examination, he successfully completed some serial 3 subtraction. His remote recall was adequate, he did not display issues with understanding or remembering questions across the interview, and his attention and concentration appeared marginal. Overall, his intellectual functioning was estimated to be in the low average range. The examiner, Alice Wang, PsyD opined the claimant was expected to be able to manage personal funds, his intellectual functioning suggested he was

able to understand, remember, and carry out simple instructions in a work setting. The claimant's attention and concentration appeared marginal, his ability to maintain attention and concentration and to maintain persistence and pace might deteriorate over extensive periods of time, if his depression was to worsen, it could negatively impact his domain by interfering with his ability to focus and concentrate. The claimant maintained capacity in responding to supervision and to coworkers in a work setting. His depression symptoms could lower his frustration tolerance and put him a bit at risk for workplace pressure at this time (Exhibit 13F). **The undersigned finds the opinion mostly persuasive as it generally consistent with the examiner's report and with other evidence of record. While further noting the consultant's opinion is somewhat speculative with use of the term "could" and lacks specificity as to the claimant's resultant functional limitations. Nonetheless, the opinion and objective findings of Dr. Wang have been considered in assessing the adopted RFC herein.**

(Tr. 20-21) (emphasis added).

Similarly to her evaluation of Dr. Watkins' opinion, the ALJ determined that Dr. Wang's opinion was "mostly persuasive" and explained her consideration in terms of supportability and consistency. She likewise noted that Dr. Wang's opinion was speculative, based on statements that Thomas' functional abilities "could" be negatively impacted, "if his depression was to worsen." (*Id.*). Thus, the ALJ found the opinion mostly persuasive, but explained why she declined to adopt Dr. Wang's findings verbatim.

As found *supra*, Thomas has not pointed to reversible error with respect to the ALJ's consideration of the opinion evidence. Even though he may point to some evidence demonstrating he is more limited than the ALJ provides in her RFC, I may not second-guess the ALJ's decision or reweigh the evidence in his favor. Rather, it appears on my review that the ALJ has provided a reasoned RFC, with sufficient explanation describing her consideration of each opinion, resulting in a decision supported by substantial evidence.

I therefore decline to recommend remand, and recommend the District Court affirm the Commissioner as to Thomas' first issue.

**B.      The ALJ did not err in her application of Social Security Ruling 16-3p.**

Next, Thomas argues that the ALJ erred in applying SSR 16-3p, and in considering his subjective symptom statements. (ECF Doc. 7, pp. 13-17). Thomas argues that the ALJ provided insufficient analysis of his symptoms, and did not provide enough specificity in her explanation, such that her reasoning is unclear to Thomas and limiting to subsequent review. (*Id.* at pp. 16-17).

The Commissioner disagrees, explaining the method the ALJ used in considering Thomas' symptoms and other evidence in the record, consistent with the requirements of SSR 16-3p. (ECF Doc. 9, pp. 15-16).

Under SSR 16-3p, the ALJ evaluates a claimant's impairment-related symptoms under a two-step process. SSR 16-3p. When assessing a claimant's subjective statements, first, "the ALJ must determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged." *Calvin v. Comm'r of Soc. Sec.*, 437 F. App'x 370, 371 (6th Cir. 2011); *see also* SSR 16-3p, 2017 WL 5180304, *3 (Oct. 25, 2017). The ALJ must determine whether there is objective medical evidence from an acceptable medical source showing that the claimant has a medical impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2017 WL 5180304, *3. If there is, the ALJ moves to the second step under SSR 16-3p and considers all the evidence to determine the extent to which the symptom affects the claimant's ability to work. *Heart v. Comm'r of Soc. Sec.,* No. 22-3282, 2022 WL 19334605, *3 (6th Cir. Dec. 8, 2022).

At the second step, the ALJ will "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." SSR 16-3p, 2017 WL 5180304, *3. In so doing, the ALJ must consider

27

the objective medical evidence as well as the claimant's reported daily activities, including several other factors, to evaluate the intensity, persistence, and functional limitations of the claimant's symptoms. *See Curler v. Comm'r of Soc. Sec.*, 561 F. App'x 464, 474 (6th Cir. 2014); SSR 16-3p, 2017 WL 5180304, *4, *7-8. Such factors can include medication, its effectiveness, and any side effects; treatment other than medication; accommodations a claimant makes to alleviate symptoms; or other daily activities. SSR 16-3p, 2017 WL 5180304, *7-8. To make this determination, the ALJ considers medical and non-medical sources, as well as the claimant's personal statements about their symptoms. *See generally id.*

However, this Court's review of an ALJ's consideration of a claimant's subjective symptoms must be deferential. A reviewing court "must affirm the ALJ's decision as long as it is supported by substantial evidence and is in accordance with applicable law." *Showalter v. Kijakazi,* No. 22-5718, 2023 WL 2523304, *2 (6th Cir., Mar. 15, 2023).

I first note that Thomas has based a portion of his argument on his mistaken view that "[a]ccording to the ALJ, [Thomas] did not have an underlying medically determinable impairment that could reasonably cause the symptoms." (ECF Doc. 7, p. 14, citing Tr. 17). This is patently false. The ALJ stated: "the undersigned finds the claimant does have underlying medically determinable impairments that could reasonably cause some symptomology. . . . In this case, a careful review of the record does not document sufficient objective medical evidence to substantiate the severity of the pain and degree of functional limitations alleged[.]" (Tr. 17). Thomas' false allegations place his arguments as to Issue Two on shaky ground. Nonetheless, the ALJ appears to have sufficiently considered his symptoms in accordance with SSR 16-3p.

In her consideration, the ALJ notes that Thomas' symptom statements regarding his residual stroke deficits were not fully consistent with the evidence of record. (Tr. 24). She cited

to Thomas' own reports that he resides alone and can tend to his own care, household chores, medication management, and shopping. (*Id.*). She also noted the inconsistencies in the available record – as examples, his providers also routinely considered his speech intelligible despite continued reports of dysarthria, or, despite his report of having difficulty with some fine motor skills, he was observed to have 5/5 grip strength and was observed to have intact fine motor skills during consultative examinations. (*Id.*).

Thomas has failed to demonstrate that the ALJ erred in her consideration of his subjective statements. Rather, my review demonstrates that the ALJ thoroughly considered Thomas' own statements of his condition, both through his testimony at the hearing, his completion of an Adult Disability Report, and from his reports to his providers. (*See* Tr. 17-24). I therefore must defer.

I decline to recommend remand as to Thomas' second issue.

## VII.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Thomas' applications for DIB and SSI be affirmed.

Dated: September 30, 2025

Reuben J. Sheperd
United States Magistrate Judge

---

## OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of

the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).